2024 IL App (2d) 230554-U
No. 2-23-0554
Order filed December 27, 2024

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(l).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| JAMES WISCHMEYER, | ) | Appeal from the Circuit Court |
| | ) | of Lake County. |
| Plaintiff-Appellant, | ) | |
| | ) | |
| v. | ) | No. 19-L-955 |
| | ) | |
| PETROCHOICE, LLC, | ) | Honorable |
| | ) | Donna-Jo Vorderstrasse and |
| Defendant-Appellee. | ) | Daniel B. Shanes, |
| | | Judges, Presiding. |

JUSTICE BIRKETT delivered the judgment of the court.
Justices McLaren and Hutchinson concurred in the judgment.

**ORDER**

¶ 1    *Held*:    We affirm the jury's verdict in favor of defendant where plaintiff forfeited his claims of trial error concerning juror replacement, witness bias, and the propriety of defendant's closing argument, and plaintiff was not prejudiced by the non-release of the audio recording of defendant's closing argument. Because our disposition of the foregoing issues relating to liability fully resolves this appeal, we need not address plaintiff's remaining arguments concerning damages or contributory negligence.

¶ 2    In this negligence action involving real and personal property damage following the rupture

of a residential home heating fuel oil tank, plaintiff homeowner, James Wischmeyer, appeals the

jury's verdict entered in favor of defendant, PetroChoice, LLC, the company that delivered fuel

oil to plaintiff's home the day of the spill. Plaintiff contends that: (1) he was deprived of his constitutional right to a 12-person jury; and the trial court erred in (2) excluding defendant's liability insurance to expose witness bias; (3) allowing defendant to reference an IEPA report during closing argument; (4) allowing defendant to refresh the recollection of an expert witness regarding the Illinois Plumbing Code; (5) allowing defendant to reference its expert's opinion regarding deterioration, rust, and corrosion of the tank; (6) denying plaintiff's proposed damages jury instruction; (7) striking plaintiff's list of personal property damages; (8) ruling that if plaintiff testified he could not afford to remediate the property, defendant could cross-examine plaintiff regarding his settlement with his homeowners insurance provider; and (9) denying the release of the digital audio recording of defendant's closing argument. We affirm.

¶ 3                                    I. BACKGROUND

¶ 4      On December 18, 2019, plaintiff filed suit against defendant alleging it negligently filled plaintiff's fuel oil tank and caused damage to his real and personal property. Defendant filed an answer denying liability and raising affirmative defenses of contributory negligence and failure to mitigate. Pertinently, defendant asserted that plaintiff failed to properly maintain and inspect the heating oil system and his plumbing and sump pump system, as well as that plaintiff's sump pump and plumbing systems were improperly configured and violated state and local building codes.

¶ 5      A jury trial was held over the course of seven days in August 2023, which was presided over by the Honorable Judge Donna-Jo Vorderstrasse. The following facts were adduced at trial, but we will supplement the facts as necessary in our analysis. Plaintiff, his wife Marta, and their teenage daughter, resided together in a single-family home located on more than 12-acres of wooded property in Barrington. Plaintiff and Marta purchased the home in 1999 and resided there, with their daughter, until December 19, 2017—the date of the fuel oil spill.

¶ 6     The home was heated using a boiler, which is part of a heating system that burns fuel oil to generate heat.  Fuel oil is chemically like diesel fuel but is dyed red to indicate its use for home heating rather than for vehicles.  The fuel oil was kept in two tanks located in plaintiff's basement. Each tank had a capacity of 275 gallons, and they were connected by a crossover pipe.  The system was equipped with a fuel gauge that provides a general indication of the fuel level.

¶ 7     Several times per year, plaintiff would order fuel oil from defendant to replenish his supply. He had utilized defendant's services during the prior several winters.  The fuel oil tanks were replenished by defendant's tanker truck, which is equipped with a fuel pump.  A nozzle, attached to the truck by a flexible hose, fits into an outdoor fill pipe on an exterior wall of the home, adjacent to the tanks in the basement. The nozzle operates similarly to those commonly found at gas stations.  Next to the outdoor fill pipe, on the exterior of the home, is a vent pipe which is designed to allow air to escape the tanks as they are filled with fuel.  The vent is angled downward so that rain is unable to enter, and it produces a flute-like "whistle" sound as air is expelled from the tanks during refueling.  As fuel enters the tanks, the fuel level rises, and the driver knows to stop pumping when the whistle stops making a sound, because the bottom of the pipe is "drown[ed] out" when the tank is full.   Under normal delivery conditions, the whistle sounds continuously throughout the filling process and for a few seconds after pumping ceases or the tanks are filled.

¶ 8     On December 18, 2017, plaintiff ordered 350 gallons of fuel oil from defendant.  The next day, on December 19, plaintiff and Marta left for work in the morning, and their daughter left for school.  At around 10:30 a.m., defendant's driver, Adrian Avila, delivered 350 gallons of fuel oil through the exterior fill valve into plaintiff's tanks inside the basement.  According to Avila, there was no indication of any problems during the delivery, and he heard the vent whistle the entire time he was pumping fuel oil.  At some point, one of the welded seams on plaintiff's tank ruptured,

causing hundreds of gallons of fuel oil to spill onto the basement floor, including into the uncovered sump pit. The pump inside the sump pit then pumped the fuel oil into plaintiff's septic tank. The sheer volume of fuel oil overwhelmed the septic tank. With the septic tank full, the sump pump caused the fuel oil to be pumped upward—to the ground floor of the home—where it discharged from the shower floor drain and toilet. The fuel oil then spread throughout the ground floor of the home.

¶ 9    Marta testified that, at approximately 5:30 p.m. that evening, she returned home from work and parked her car. As soon as she arrived, she noticed an overwhelming odor of "gasoline or something like that." Upon entering the rear door of the home and turning on the lights, she saw fuel oil "all over [the] house, all over the floor, all over the furniture," including in the living room, kitchen, and bathroom. Daisy, the family dog, was also covered in fuel oil. Marta did not go into the basement, but she could see that the basement floor was likewise covered with oil, as were the steps down to the basement. "[O]il was just spilling for hours everywhere." The smell nauseated her, and she was "in shock." Marta called plaintiff and informed him that "there was some kind of an explosion" and that the "whole house was covered in toxic oil." Plaintiff told her that he would call 911. Marta thereafter received a call from the fire department, who instructed her to evacuate the home. She grabbed Daisy and exited the home without gathering any personal belongings. More than 20 firetrucks responded to the call. Marta testified that no one had lived in the home since that day. The "house looks exactly like it looked [the] day before [they] were displaced."

¶ 10    Plaintiff testified concerning his efforts to remediate his home and personal property following the spill. In the immediate aftermath, he engaged HazChem Environmental Corporation to pump oil out of the home. HazChem pumped, squeegeed, and placed oil-absorbing pads throughout the first floor and basement, but significant oil pooling nevertheless remained. When

plaintiff reentered the home a few days later, he observed oil on the kitchen floor, including under the dishwasher, stove, and refrigerator.  Oil was also present in the first-floor bathroom, as well as in portions of the dining room, living room, and hallway.  Plaintiff estimated that half of the floor surface on the first floor was still covered in oil.  In the basement, oil was dripping from the ceiling onto the tables and basement floor, including onto books, toys, and laundry.  Plaintiff also noted that firefighters responding to the emergency had tracked oil onto the second floor of the home.

¶ 11    Plaintiff testified that his family could no longer live in the home because the odor of fuel oil was overwhelming.  He believed the home needed to be torn down.  He conceded, however, that he valued the property at $800,000 as collateral for a line-of-credit loan following the spill, and he did not inform the appraiser or the bank that he believed the home was uninhabitable or needed to be torn down.  After the spill, plaintiff and his family lived with friends for a period, but they eventually purchased another home to use as their primary residence.  Plaintiff explained that, after the spill, he rented the property to tenants for storage purposes.

¶ 12    Plaintiff testified that, over the course of several years following the spill, he returned to the house multiple times per week to clean, repair, and salvage what he could.  He wore a respirator, opened windows to ventilate the space, and repeatedly cleaned the floors with mops.  In fact, he was "still doing it" and taking "one step at a time."  Plaintiff further testified that he obtained an itemized remediation estimate from ServPro, which is a company that specializes in cleaning, restoration, and remediation services, totaling $322,000.[1]  However, aside from hiring

---

[1]Prior to trial, plaintiff successfully moved to bar defendant from referencing plaintiff's receipt of a $1 million settlement he received from his homeowner's insurance provider.  The court also ruled, however, that if plaintiff testified that he was unable to afford the ServPro estimate,

HazChem "at the very beginning," plaintiff had not engaged any other professionals to clean or remediate the property in the nearly six years since the spill.

¶ 13    Plaintiff also testified concerning a list he had prepared detailing the items destroyed by fuel oil. The list reflected a total personal property loss of $131,000. On cross-examination, he acknowledged that some of the items on the list, such as a Sub-Zero refrigerator and a Viking stove, were not in need of replacement, but they merely required servicing or repairs. He explained that he was able to salvage some items included on the list and had since prepared an updated version "with what [he] felt was more accurate information." He offered to provide it to defendant later. Although plaintiff was "not sure where the total number lands," the $131,000 estimate "didn't seem out of line," but he conceded that the list was "not correct as it stands." The circuit court then struck the personal property list, which had been offered as an exhibit.

¶ 14    Plaintiff further testified concerning the events leading up to the spill. On November 7, 2017, which was the fuel oil delivery immediately prior to the delivery at issue in this case, plaintiff received a call from defendant stating that the driver had experienced a "splash back" during the delivery and that oil had spilled on plaintiff's home and on the ground. The employee inquired whether plaintiff's tank was full, to which he responded in the negative, explaining that he had monitored his tank levels for years and knew they were not full. Plaintiff believed that he would have asked the employee to "slow down" and "pump slow" in the future to prevent splash back.

¶ 15    Plaintiff testified that, within a couple of years of moving into the home, a service person replaced the burner and filter on the heating system. Other than that, no service or maintenance had been performed on the heating system for more than 15 years prior to the spill. He explained,

---

defendant could cross-examine him regarding the settlement.

however, that he would visually inspect the tank whenever he passed by it in the basement, and that he would inspect the outside piping whenever he did yardwork. Plaintiff further testified that, "over the years," his brother-in-law had performed "some plumbing work" in the basement, including replacing certain pipes. He was unsure whether any pipes were re-routed. Plaintiff did not have an inspector review the plumbing work to verify that it was done correctly, and he was unsure whether his brother-in-law was a licensed plumber. Plaintiff acknowledged testifying at his deposition that his brother-in-law was not a licensed plumber.

¶ 16     David McCoy, a licensed environmental geologist, performed a limited site investigation of plaintiff's property. After conducting a visual inspection, McCoy used a Geoprobe to extract soil samples from plaintiff's yard, which he explained is capable of extracting soil samples up to five feet deep and 1¾ inches in diameter. He also used a concrete coring machine to take a soil sample from beneath the basement floor. He analyzed the samples using a "handheld gas reader," or a photoionization detector, to determine whether any volatile gases were emitting from the samples. Segments of core samples that released gasses were sent to a lab for further testing. The lab results demonstrated that several samples from plaintiff's home exceeded Illinois' environmental safety thresholds, namely the Tiered Approach to Corrective Action Objectives, or "TACO" regulations. Two samples in the septic field, two samples in the backyard, and the sample from the basement exceeded the permissible soil saturation limits. However, McCoy conceded that most of the samples were within the normal range for the tested substances, including the sample pertaining to plaintiff's well water. The samples that had elevated levels of contaminates were from the areas that he expected fuel oil would be detected based on his understanding of the fuel tank rupture and subsequent pumping of fuel throughout plaintiff's septic system. Based on

these findings, as well as his personal observations of the property, including the odors he observed in the basement, plaintiff's home was uninhabitable in its present condition.

¶ 17    McCoy prepared a remediation plan, which included enrolling the property in a remediation program through the Illinois Environmental Protection Agency (IEPA). He also recommended that additional soil samples be obtained to delineate the edges of the contamination. To remediate the contamination, McCoy opined that the septic field would have to be over-excavated and backfilled with clean fill. Additionally, he recommended remediating the contaminated soil beneath the house by removing the foundation and over-excavating three feet of soil under the house footprint, which would be a "complicated procedure." He was unsure whether the home could stand with the soil removed from beneath it, meaning that demolition might be necessary. McCoy estimated the total remediation cost to be between $168,000 and $250,000. The estimated cost to remediate the property had such a wide range because McCoy did not know the extent of where the fuel oil had spread, and additional testing was necessary.

¶ 18    Peter Alvey, an expert in the field of environmental contaminant dispute investigation and management, testified that he was employed as an environmental engineer by Roux Associates, which is an environmental engineering and geology company. He had over 30 years of experience in environmental dispute investigation and management. Plaintiff provided Alvey with various photographs, deposition transcripts, and other materials so that Alvey could form an opinion and prepare a report concerning the cause of plaintiff's tank rupture. Alvey acknowledged that fuel oil tanks are uncommon in the Midwest, but he noted that many homes in the Northeast utilize them, where there are "a lot of incidents with oil tanks with overfills and spills." He had investigated over 100 such residential fuel tank failures and spills.

¶ 19    Alvey opined that plaintiff's tank ruptured because it was over pressurized during defendant's fuel delivery.  Several circumstances led him to this conclusion.  Alvey emphasized that photographs of the basement floor depicted "two dark circles next to the legs of the tank," which showed "where the feet had been."  Alvey noted that the rupture caused the tanks to be displaced by approximately six inches, but he noted that the painted basement floor did not show evidence of scratching caused by the path of the tank legs.  He opined that the rupture occurred violently and with such downward force that "the tank system was lifted up off the ground a little bit in order to move without damaging the paint" on the floor.  Additionally, the shape of the opening in the tank was "open or fish-mouth shaped," which Alvey testified is found only in sudden, violent, and catastrophic releases.  In Alvey's view, "the release did not occur over an extended period of time and was not gradual."  He was unsure, however, how long it took for the buildup of pressure to occur inside the tank.  Aided by his report, Alvey explained the "standard physics calculations" that he performed to determine the amount of force necessary to lift the tanks during the rupture and come to a rest six inches away from where they were originally installed.  Alvey stated that, during typical fuel oil deliveries, the "normal pressure is only like seven or eight pounds per square inch gauge (PSIG)."  In his opinion, based on the force that was required to lift the tanks and displace them by six inches, the internal pressure "would be approaching 100 or 150 [PSIG], perhaps."  Alvey also obtained the manufacturer's fact sheet for the pump on defendant's tanker truck, which had a pumping capacity that exceeded 100 gallons per minute.  Alvey opined that if fuel oil was pumped at that rate, the pressure would build within the tank and create significant backpressure on the pump.  In his report, Alvey explained that "[t]his pressure increase on the *** pump would rapidly drive up the pump's output pressure while maintaining the flow rate until the pressure was released or the system was damaged."

¶ 20     Alvey conceded that he did not personally inspect plaintiff's fuel tanks in preparing his report, but he did not believe that an on-site inspection would have affected his ultimate opinion, because he was provided with photographs and videos from the scene and other data. Similarly, he did not personally inspect the tanker truck involved in this incident, but he was provided photographs of it and was able to identify its operative equipment.

¶ 21     Alvey was aware that the vent pipe elbow was disassembled after the rupture and that organic material was found inside of it, but he did not evaluate the extent and nature of that organic material because plaintiff's counsel "did not ask [him] to do that." Plaintiff "never asked [Alvey] to figure out how much that debris had diminished the air flow." Nevertheless, Alvey did not believe a partial blockage of the vent pipe by organic material "would have been the singular cause" of the tank rupture, because the vent pipe made a whistle sound the entire time that Avila pumped fuel oil into the tanks. Alvey was aware that the vent whistle was disassembled post-rupture and found to be functioning. He did not know the diameter of the vent pipe, how much air must pass through it to sound the whistle, or the extent to which the obstruction restricted the flow of air being expelled during the refueling process. After being shown a photograph of the organic material that was in a cross section of the vent pipe, Alvey opined that the debris was insufficient to cause the tank to fail, because any buildup of air pressure would have dislodged the material long before causing the tank to rupture. Nevertheless, he conceded that a fuel oil tank could become over-pressurized if "the vent pipe is obscured and is not allowing air to come out quickly enough." Moreover, Alvey agreed that fuel storage tanks "can weaken over time," but he did not know if that occurred in this instance. Alvey was not "a metallurgist by training," and he could offer no opinion regarding metal failure. He also could offer no opinion as to the maintenance requirements of the tanks.

¶ 22    Avila testified that he had worked for defendant as a fuel delivery associate for approximately eight years. Before Avila was authorized to deliver oil to residential customers, he completed safety training, studied the "PetroChoice Safety Manual," and shadowed an experienced delivery driver. As part of that training, he was instructed regarding the dangers of over pressurizing a fuel tank. However, he could not recall whether he denied, during his deposition, that he had received such training. Avila further explained that delivery drivers are prohibited from using cell phones while pumping fuel, as this could distract them from their duties and pose a danger. He denied ever using a cell phone while pumping fuel and noted that the task requires the use of both hands.

¶ 23    Avila was very familiar with plaintiff's fuel oil system, having delivered fuel to the home more than twenty times in the two to three years preceding the incident. He testified that during the prior delivery in November, he experienced a "splash back," meaning some of the fuel "sprinkled back at [Avila] and on the wall." He explained that the fuel nozzle may be fitted with a "rubber boot," which is a circular attachment that is meant to form a seal with the fill pipe. To create a seal, the delivery driver needed to press the nozzle and rubber boot into the fill pipe. He always used a rubber boot on each fuel delivery. Nevertheless, during the November delivery, Avila "probably moved it a little" or made a "bad movement," which broke the seal and caused fuel to spill from the fill pipe. Avila reported the splash back to his manager.

¶ 24    Avila further testified regarding the fuel delivery on the date in question. Avila pumped fuel into plaintiff's tanks "slowly," as instructed in the delivery notes. He noted that the fill pipe on plaintiff's home had a 90-degree angle resembling an "L" shape, which could cause fuel to "shoot back at you" if pumped too quickly. That day, Avila squeezed the trigger "about halfway," which Avila estimated pumped between 20 and 30 gallons per minute. He conceded that, at his

deposition, he did not know what the flow rate was on the date of the incident. He believed that, if squeezed to "full blast," the nozzle could dispense about 60 gallons per minute. Avila monitored the pumped fuel volume through a handheld device that was wirelessly linked to the truck. The device did not indicate the fuel rate, "[j]ust the gallons." It took approximately 15 minutes to pump the 350 gallons that plaintiff ordered.[2] He did not detect any problems during the refueling. He heard the vent whistle continuously and noted no splash back, as he kept the nozzle and rubber boot steady. Avila stated that, if he had suspected any problems, he would have reported it to his supervisor, just as in the November delivery. After he finished pumping the fuel oil, it took Avila five to ten minutes to wrap up the hoses and gather his equipment so that he could continue his delivery route. Before leaving plaintiff's residence, he printed a receipt from his truck and placed it in plaintiff's door. The receipt was entered into evidence and indicates it was printed at 10:30 a.m. Avila delivered fuel to several other sites that day, and there were no other reported problems. The next day, Avila completed an incident report with his manager. Following the spill, Avila continued to deliver fuel oil to other residential customers "just like he had before," without any other incidents involving a tank rupture or over pressurization. Avila had no reason to dispute that his cell phone records showed that he made several outgoing calls during his 11-hour shift.

¶ 25    Home inspector Luke Bartlett testified that he performed an air quality test at plaintiff's residence in June 2023, which was more than five years after the tank rupture. He was commissioned by Mold Test Company, which instructed him on the testing method. Bartlett observed a "pinkish, reddish" residue on the first floor, including around the kitchen island, near the back door, threshold to the living room, family room, and office. Similar discoloration was found in the basement, including on the floor joists and in streaks leading into the sump pit. Inside

---

[2]This estimate represents an average flow rate of approximately 23 gallons per minute.

the ruptured fuel tank, he observed "dried-up diesel fuel," which he described as "sludge." The odor of fuel oil was persistent throughout the house, but there was "no liquid present," only discoloration associated with fuel oil. Bartlett opined that the "livability of the property is very difficult to be in," due to both the test results and his experience of symptoms like headache, dizziness, and disorientation within 15 to 20 minutes of entering the home. Bartlett placed a "TO-15" air canister approximately 50 feet away from the ruptured fuel tank. He explained that the canister is a negative pressure tank that collects ambient air for testing by a laboratory. Although he would typically take air quality samples from each floor and outside the home, he did not do so at plaintiff's home because Mold Test Company did not instruct him to do so. Lacking experience with the TO-15 canister, Bartlett followed a video tutorial to assemble it. Upon analysis, the laboratory reported diesel fuel-related components between 4 to 24 times above the acceptable levels, which Bartlett opined "would be extremely bad for health." In addition, he used a "PIC meter," which has air quality testing capabilities, in various areas of the home. In the kitchen, it registered "poor quality" levels of carbon dioxide, total volatile chemicals, and formaldehyde. He acknowledged, however, that neither carbon dioxide nor formaldehyde are related to fuel oil, and he was uncertain if his symptoms were caused by the fuel oil residue, carbon dioxide, or formaldehyde. Surprisingly, the PIC meter showed "good quality" levels for these metrics in the basement, where the fuel odor was strongest. Bartlett attributed these "good" readings to increased air circulation caused by his movement through the basement during his inspection.

¶ 26   In defendant's case, certified real estate appraiser Steven Kephart testified that in September 2020, at the request of a mortgage broker in connection with a mortgage or line-of-credit application, he appraised plaintiff's residence and prepared a report. Kephart met plaintiff briefly upon arrival and, after a short conversation, conducted the inspection alone, taking

photographs and notes. The home appeared lived in, with everyday items in the kitchen and personal belongings in the basement. Kephart typically inquires whether the home has any hidden major defects or dangers that could impact the value of the property, and if the homeowner discloses such a defect, he notes it on his report. Because his report did not include any such indication, Kephart believed plaintiff did not disclose any major defects or dangers to him. He did not detect the odor of fuel inside the home, but he could not recall if the windows were open or if any fans were blowing. Kephart observed some "reddish" stains on the basement floor and sump pit, but he did not believe the stains were unusual because the water for the home was supplied by a well and thus likely high in iron content. He did not inquire about the stains. He did not notice any staining on the floor of the ground level, but he observed red staining inside the toilet bowl, which he assumed was caused by the fact that the water was provided by a well. Outside, he observed the septic field, which showed no sign of fuel oil contamination, but he acknowledged that he was not an environmental expert. In his report, Kephart stated that there were no physical deficiencies or adverse conditions that affected the property's habitability or structural integrity. Kephart opined that plaintiff's home had a market value of $723,000.

¶ 27    Chris Friis, chief lending officer at First Secure Bank & Trust, testified that, in the autumn of 2020, he received an application from plaintiff seeking a line-of-credit loan on plaintiff's home. Friis examined several documents in evaluating the application, including: (1) plaintiff's September 2020 personal financial statement reflecting plaintiff's estimation that his home was worth $800,000; (2) Kephart's appraisal report; (3) an appraisal report prepared by Karen Manning on behalf of the bank and which valued plaintiff's residence at $600,000; and (4) a 24-month residential lease agreement reflecting that plaintiff was leasing the subject property to a tenant for approximately $2,400 per month. The rental income was noted as the primary source of repayment

for the loan. Friis met with plaintiff and conducted an in-person walk-through of the property, including all three levels and the yard. He did not observe any evidence of oil on the floor or anything that would cause him concern about making the loan, such as an odor of fuel oil, but he could not recall if windows inside the home were open or if scented candles were burning. Friis was aware of the oil spill when he processed the loan application, because plaintiff stated in a letter that there had been a "small explosion" inside the home, but no fire, and that he was "not able to return to the home that night" because oil had spilled in the basement. Friis did not seek an environmental assessment of the property. Based on Manning's appraisal, the bank concluded that plaintiff's home was worth "at least" $600,000. The bank provided plaintiff a $450,000 line of credit, which plaintiff repaid in full.

¶ 28    John Cignatta, a licensed environmental engineer, testified that he founded Datanet Engineering, which is a specialty construction and engineering petroleum systems company that designs, builds, inspects, and removes fuel systems for gas stations, oil plants, emergency generator facilities, and similar operations. He is also an accredited tank inspector for large, field-erected tanks, and he teaches petroleum systems installation, removal, and inspection worldwide. Cignatta has investigated nearly 1,000 above-ground storage tank failures involving fuel oil systems and has been retained by homeowners and oil industry companies alike, as well as by various state and federal agencies.

¶ 29    Cignatta first investigated the site in December 2017, just days after the incident. He inspected the living areas of the home, including the kitchen, living room, and bedrooms, but he did not observe oil saturation in these spaces. Instead, he observed kitty litter and oil-soaked sorbent pads on the floor of the bathroom and hallway, which he noted remained on the floor for several years after the spill. He found no free oil anywhere on the first floor and saw no evidence

that oil had spread into other rooms or soaked through the floor joists and "rain[ed]" back into the basement. He conceded, however, that the first floor was not "liquid tight."

¶ 30     A label welded to the ruptured tank revealed that plaintiff's tank was 55 years old and was made of 14-gauge steel, which Cignatta testified is "exceedingly thin." He explained that fuel oil tanks in the United States had not been manufactured with 14-gauge steel for over 50 years. Cignatta noted that he saw "the separation of the weld at the end of the tank and the tank had literally had a rupture of its head to shell weldment." In other words, the weld was "ripped apart." Cignatta testified that the separated metal should have been "bright and shiny" because it had not been exposed long enough to corrode. Aided by photographic exhibits, Cignatta noted that corrosion and rust were "readily manifest" on the interior of the metal seam, including where the weld separated.

¶ 31     Cignatta also disassembled and inspected the tank's vent pipe and whistle. He applied a vacuum to the vent pipe and was able to hear a "clear, discernible whistle." He removed the elbow from the vent pipe and found organic and inorganic debris accumulated inside it, which he determined had obstructed the airflow. Cignatta explained that the debris could easily have been dislodged with an air compressor, but the velocity of air exiting the tank during a fuel delivery would have been insufficient to clear it. Cignatta opined that, due to the obstruction in the vent pipe, air was unable to exit the tank as quickly as the rate that the fuel was pumped in, which resulted in a linear, gradual increase in the internal pressure of the tank. He explained that, for example, if fuel was being pumped into the tank at a rate of 54 gallons per minute, but an equivalent of just 53 gallons of air per minute was exiting the system, Avila would have had no indication that there was any problem, because "you can't hear pressure," and the whistle continued to sound throughout the fuel delivery. Cignatta opined that the pressure increased gradually during the

roughly six or seven minutes that it took Avila to pump the fuel oil. He further tested that, likely near the end of the delivery, the tank "start[ed] to inflate like a football." He stated that the side of the tank ballooned outward and pressed against the basement wall, which displaced the tanks by approximately 6 inches, the movement of which was "rather slow" and lasted several seconds. Cignatta could offer no opinion on the cause of the splash back of fuel that Avila experienced during the November 2017 delivery, but he noted Avila's assertion that the boot "was off kilter a little bit."

¶ 32    Cignatta opined that plaintiff's heating system was improperly maintained, noting that the tanks were 55 years old and that the vent was "clearly compromised regarding the amount of accumulated debris," not just before the elbow, but "along [the pipe's] length." He opined that plaintiff's failure to maintain the fuel system and vent whistle in a free and clear state caused the tank to rupture. The failure to maintain the venting system allowed organic debris to accumulate, which over time would slow down the rate of air coming out, which "when it's mismatched with fuel going in *** faster than air comes out, that's going to cause the air to be retained and pressurize[] the tank," which is "not a pressure vessel," but rather is an atmospheric tank. Cignatta explained that, during normal operations, the tank should not be pressurized, and its actual limits are -½ to 1 PSI. Additionally, he detailed that new tanks undergo momentary integrity testing while they are still at the factory at an internal pressure of 5 to 7 PSI. Plaintiff's tank, however, was 55 years old and had rust "[b]oth inside and out." He explained that residential tanks should never be pressurized to that level, and if the pressure went "past five to seven, eight, nine PSI, it would start to inflate like a football" and "literally would burst at the seams," which is what he believed happened in plaintiff's case. Cignatta conceded that no regulation in Illinois governed the periodic maintenance of fuel oil storage tanks, nor was there any recommended timeframe for

the replacement of such tanks. He explained, however, that much like the absence of regulations governing the periodic inspection of automobile brakes, it is necessary for a homeowner to inspect and maintain a home fuel oil tank, particularly when the tank is 55 years old.

¶ 33    Cignatta also inspected the delivery truck that was used to refill the tank. He described it as a "fairly advanced" truck equipped with safety devices and features that are uncommon for home-heating-oil-delivery trucks. For example, the pump was powered not by the truck's engine, but by a separate hydraulic control system that produces a fixed velocity for the pump. "The driver can't hit the gas pedal to make [the pump] go faster, which he could with a normal truck." Cignatta explained that the truck was also equipped with a pressure relief controller designed to stop the flow of fuel if the pressure reached 27 PSI. He examined the pressure relief controller and found that it worked "perfectly." He also reviewed the truck's maintenance records. In June 2017, the truck passed inspection by the Illinois Department of Agriculture—Bureau of Weights and Measures, which assessed both the fuel flow rate and the accuracy of the fuel gauge. The Department determined that the truck's flow rate was 54 gallons per minute, and it confirmed the accuracy of the metering system. Cignatta's own testing revealed a flow rate of 56 gallons per minute "at full blast." He noted, however, that the real-world flow rate would be slower, because flow decreases as fuel is pushed through any piping or connections. Cignatta testified that there was no indication that Avila pumped the fuel in "too fast," noting that the limitations of the truck, hose, and shut-off valve, even if pumped at "full blast," could not have ruptured a properly maintained tank.

¶ 34    In June 2023 Cignatta conducted air quality testing in plaintiff's home. Cignatta was not overcome with an odor of oil, even in the basement, although he could smell oil "right inside the tank." He noted that the ruptured tank remained in the home even more than five years after the

incident. His equipment indicated that there were "very, very low levels of volatile organic compounds" inside, "much like a typical home." There was nothing "extremely elevated anywhere in the house." He stated that there was no carbon dioxide or formaldehyde in fuel oil, and he noted that "carbon dioxide is a combustion product" that would be produced if something is rotting or exhausting. These substances have "nothing to do with fuel oil." Cignatta reviewed whether the IEPA had a case file "and things of that nature" regarding the instant matter, and he denied that there was any requirement or recommendation from the IEPA to clean up or remediate anything in plaintiff's yard. He stated that he "specifically spoke with the [IEPA] officials, and the file was closed. There was an incident, and the incident was cleaned up." Cignatta conceded that he did not obtain any core samples from plaintiff's yard. He testified that the home could be fully remediated by removing the ruptured oil tank and cleaning the home.

¶ 35    Cignatta also examined the configuration of plaintiff's basement plumbing, which related to defendant's affirmative defense of contributory negligence. Cignatta noted that the basement sump pit was uncovered and that a greywater line from the utility sink and washing machine emptied into it—something Cignatta stated should "never" be connected in this manner. Additionally, the sump pump was configured to pump water, not to an area in the outside yard, but into plaintiff's septic tank. According to Cignatta, these two features violated "applicable building codes." He further explained that because the sump pit was uncovered, when the fuel oil tank ruptured, some 500 gallons of fuel oil spilled into it. Due to the improper plumbing setup, the fuel oil was then pumped into the septic tank, quickly overwhelming it. With the septic tank overwhelmed, the fuel oil was then pumped by the sump pump "all the way up," and discharged from the first-floor shower drain. He testified that the oil "never should have gotten in" the septic tank. He opined that the damage from the oil spill would have been minimal if the plumbing

configuration had complied with the Illinois Plumbing Code, as the oil would have been confined to the basement and perhaps a spot in the yard where the sump pump should have discharged to.

¶ 36 On cross-examination, Cignatta was unable to recall the precise code section that he believed plaintiff's plumbing violated, but he stated that it was the portion of the Plumbing Code requiring that all sump pumps used for gray water be fully enclosed and separate from any floor drain system. He explained that it was also a violation of the Plumbing Code to tie plaintiff's septic line to his sump pump. He clarified that he was not a resident of Illinois, but that, during his investigation, he inquired of various state agencies regarding plumbing and environmental standards. Lake County officials directed him to the Plumbing Code, which Cignatta reviewed in forming his opinion. He conceded that, if he wrote down the code that plaintiff's plumbing was not in compliance with, it was not in his notes. He also did not generate a report regarding his opinions in this case. On redirect, over plaintiff's objection, defendant was permitted to refresh Cignatta's recollection with section 890.1360 of Title 77 of the Illinois Administrative Code (77 Ill. Adm. Code 890.1360 (2014)), which governs "Sanitary Wastes below Sewer."

¶ 37 Cignatta disagreed with Alvey's opinion that the tank was rapidly over-pressurized, noting that there would not have been enough time for it to swell and push away from the wall. He also pointed out that the head weldment was not broken free, and Avila did not hear a loud sound during the delivering, which Cignatta would have expected if the tank was rapidly over-pressurized. He also disagreed with Alvey's opinion that the rupture caused the tank to lift into the air. Instead, Cignatta stated that the evidence simply showed that "[t]he weld opened up and the fuel fell on the floor." He disagreed with Alvey's opinion that it was possible for the tank to reach 150 PSI, and he stated the fuel delivery hose would "rip apart" if the pressure exceeded 100 PSI.

¶ 38    Following a jury instruction conference and closing arguments, the trial court instructed the jury that defendant denied negligence in its fuel oil delivery as well as asserted that plaintiff's contributory negligence in the maintenance of his fuel oil tank system and the design of his plumbing and sump pump systems exceeded 50% of the total fault.  It further instructed the jury that if it found for defendant or found that plaintiff's contributory negligence was more than 50% of the total proximate cause of plaintiff's damages, then it should use Verdict Form C. Additionally, the jury was instructed that if it found for defendant on liability, it would have no occasion to consider damages.

¶ 39    On August 22, 2023, the jury utilized Verdict Form C and returned a general verdict in favor of defendant.  Plaintiff did not submit a special interrogatory as contemplated in section 2-1108 of the Code of Civil Procedure (Code) (735 ILCS 5/2-1108 (West 2022)) to test the basis for the jury's verdict.

¶ 40    On September 20, 2023, plaintiff filed a posttrial motion seeking judgment notwithstanding the verdict or, in the alternative, a new trial.  After hearing argument on November 9, 2023, the trial court ruled that it did not commit any error and denied posttrial relief.  In announcing its ruling, the court stated that the jury's verdict was not unexpected or against the manifest weight of the evidence.

¶ 41    On December 5, 2023, plaintiff filed a "motion to release digital recording of trial," arguing that the trial transcript did not accurately reflect defendant's closing statement or plaintiff's objection thereto.[3]

---

[3]Plaintiff contends in his statement of facts—without citation to the record—that he consented to the use of private court reporter on the condition that a recording of the proceedings

¶ 42    The following day, on December 6, 2023, plaintiff filed a notice of appeal seeking review of the trial court's November 9, 2023, denial of plaintiff's posttrial motion. Plaintiff indicated that he sought entry of judgment in his favor notwithstanding the verdict or, in the alternative, reversal of the judgment in favor of defendant and a remand for a new trial.

¶ 43    On January 18, 2024, the trial court held a hearing on plaintiff's "motion to release digital recording of trial," during which the court reporter who transcribed the trial transcripts and her supervisor testified. Both witnesses testified that they had reviewed the audio recording and the written transcript and found no inconsistency. The trial court found both witnesses credible, certified that the written transcript was accurate and conformed to the truth pursuant to Illinois Supreme Court Rule 329 (eff. July 1, 2017) and denied plaintiff's motion. In so ruling, the trial court determined that releasing the audio recording was neither necessary nor appropriate because it was the court reporter's personal property, and there were no inconsistencies or ambiguities identified by the court reporter or her supervisor that would prevent the certification of the record as accurate. The court also commented that the transcript conformed with its memory of the trial.

---

be available to check against any discrepancies in the transcript. Plaintiff is reminded that Illinois Supreme Court 341(h)(6) (eff. Oct. 1, 2020) requires that an appellant's statement of facts be stated accurately and fairly and supported by appropriate reference to the pages of the record. Plaintiff's assertion hinges on a condition that he acknowledges is *also* missing from the transcript. In his motion seeking release of the audio recordings, plaintiff lamented that his insistence that the recordings be made available as a prerequisite to agreeing to a private court reporter was likewise "not included" in the transcript.

¶ 44 On January 22, 2024, plaintiff, pursuant to Lake County Local Rule 1-1.08(c)(6), filed a motion seeking the digital recording, which he noticed up before the Honorable Judge Daniel B. Shanes, Chief Judge of the Nineteenth Circuit Court. Plaintiff asserted that the motion had a "good cause basis" because his recollection of defendant's closing argument differed from the transcript, and he wished to obtain the recording so that it could be subjected to a "forensic examination by plaintiff's audio expert."

¶ 45 On February 15, 2024, Judge Shanes entered a written order denying plaintiff's motion to release the digital recording. In so ruling, Judge Shanes noted that plaintiff had requested "this Court [to] review the findings of Judge Vorderstrasse which this Court declines to do as it is not a Court of Review." Judge Shanes also found that plaintiff had not shown "good cause" under the local rule for the court to order dissemination of the audio recording. On February 26, 2024, plaintiff filed a motion to reconsider, which Judge Shanes denied on March 25, 2024.

¶ 46                                        II. ANALYSIS

¶ 47 Plaintiff seeks a new trial, and he purports to raise nine arguments on appeal. First, plaintiff argues that (1) he was deprived of his constitutional right to a 12-person jury. Next, plaintiff argues that the trial court abused its discretion in: (2) excluding defendant's liability insurance to expose witness bias; (3) allowing defendant to reference an IEPA report during closing argument; (4) allowing defendant to refresh Cignatta's recollection regarding the Plumbing Code; (5) allowing defendant to reference Cignatta's opinion regarding deterioration, rust, and corrosion of the tank; (6) denying plaintiff's proposed damages jury instruction; (7) striking plaintiff's list of personal property damages; (8) ruling that if plaintiff testified that he was unable to afford to remediate the property, defendant could cross-examine him regarding his settlement with his homeowners

insurance provider; and (9) denying the release of the digital audio recording of defendant's closing argument. We address only those issues necessary to resolve the appeal.

¶ 48                                    A. Constitutional Right to a 12-person Jury

¶ 49    Plaintiff first argues on appeal that he was deprived of his constitutional right to a 12-person jury because one of the jurors, who was replaced by an alternate juror before deliberations began, was hard of hearing and possessed only a limited comprehension of English. Relying on section 2-1106(b) of the Code (735 ILCS 5/2-1106(b) (West 2022)), plaintiff argues that the trial court violated the Code by dismissing the juror and replacing him with an alternate. Section 2-1106(b) provides:

> "The court may direct that 1 or 2 jurors in addition to the regular panel be impanelled to serve as alternate jurors. Alternate jurors, in the sequence in which they are ordered into the jury box, shall replace jurors who, prior to the time the jury retires to consider its verdict, *become* unable to perform their duties. Alternate jurors shall be drawn in the same manner, have the same qualifications, be subject to the same examination and challenges, take the same oath, and have the same functions, powers, facilities, and privileges as the principal jurors." (Emphasis added.) *Id*.

¶ 50    According to plaintiff, section 2-1106(b) permits the use of an alternate juror only to replace a juror who is qualified in the first instance, not to replace an unqualified juror. Plaintiff asserts that the juror did not *become* unable to serve on the jury, but rather, he was ineligible to serve because he did not meet the qualifications to sit on a jury. (See 705 ILCS 305/2 (West 2022)). Plaintiff argues that, therefore, the "case was heard by a jury of 11." Defendant responds that plaintiff has procedurally defaulted this argument because he failed to object at trial and, in fact, affirmatively agreed to the juror's dismissal. Defendant further contends that, regardless, the

trial court acted within its discretion by dismissing the juror and seating an alternate. We agree that plaintiff has forfeited review of this issue. An examination of the trial court proceedings, including plaintiff's acquiescence, makes clear that this argument is forfeited.

¶ 51 On the morning of the sixth day of trial, prior to defendant calling Cignatta, the trial court informed the parties that a juror, whom the court referred to as "[juror] badge number 427," handed a note to the bailiff requesting to be released from the jury. The note, which the court read aloud to the parties, pertinently stated:

> "I am writing to request an excuse from jury duty on the grounds that due to my limited English, I have a hard time understanding the trial. I am unable to properly take notes due to not being able to write notes in English.
>
> ***
>
> My daughter *** helped me write this letter."

The court commented that the juror likely acted in good faith, but that he eventually realized he was unable to comprehend the trial due to the complexity of the testimony and subject matter. The court noted that, "fortunately," there were two alternate jurors, and it stated that "the plan would be to excuse him[,] and the *** next alternate would be in his place." The court requested feedback from the parties and asked whether there were any specific questions they wished the court to ask the juror to determine whether he was attempting to evade jury service.

¶ 52 Plaintiff was given the first opportunity to respond and stated, "[j]udge, I have no objection to the juror being dismissed." He lamented that the juror did not disclose his difficulty understanding English during jury selection, noting that another prospective juror was excluded for this very reason. "[T]hat should have tipped him off, but water under the bridge, your Honor." Plaintiff continued, "I need a juror that understands the arguments in this case in order to carry my

burden of proof, and I have no objection." Defendant, in turn, agreed that the trial court should question the juror, and it expressed a desire for the court to inquire why the juror neglected to raise the issue earlier. The juror was then sworn in and, with help from an interpreter, informed the court that he had hearing loss in both ears and that he was "not understanding anything." The juror asserted that he "told the ladies on the second floor" multiple times that he "doesn't hear" and "can't understand," and he did not hear the court when it asked the venire, as a group, whether it understood English. Convinced that he was not attempting to evade jury service through a ruse, the court dismissed the juror and seated the first alternate juror, commenting "[t]his is why we have alternates." The court also noted that one alternate juror remained available.

¶ 53    The doctrine of invited error or acquiescence provides that a party cannot complain of error which that party induced the court to make or to which that party consented. *In re Detention of Swope*, 213 Ill. 2d 210, 217 (2004). If a party acquiesces to proceeding in a particular way, "he is not in a position to claim he was prejudiced thereby." (Internal quotation marks omitted.) *People v. Villarreal*, 198 Ill. 2d 227, 260 (2001). Here, plaintiff cannot now complain of error when the trial court requested his input, and he twice stated that he had no objection to excusing the juror.

¶ 54    Forfeiture aside, no error accrued because plaintiff's right to a 12-person jury was preserved throughout the trial. At the outset, we note that the parties dispute the applicable standard of review. Plaintiff contends that our review is *de novo* because, in his view, his constitutional right to a 12-person jury was denied. See *Kakos v. Butler*, 2016 IL 120377, ¶ 28 (holding the Illinois Constitution protects the right to a jury panel composed of 12 members). Defendant, however, asserts that the issue is reviewed for an abuse of discretion. We agree with defendant. "Matters relating to jury selection and management are generally within the discretion of the trial court." *People v. Roberts*, 214 Ill. 2d 106, 121 (2005). "The discharge of a juror and

the impaneling of an alternate is an act of discretion by the trial judge, and there must be a showing of prejudice in order for a reversal to be required." *Snyder v. Poplett*, 98 Ill. App. 3d 359, 365 (1981). "An abuse of discretion is the most deferential standard of review, and a trial court abuses its discretion only when its decision is unreasonable, arbitrary, or no reasonable person would take the view it adopted." *Union Tank Car Co. v. NuDevco Partners Holdings*, *LLC*, 2019 IL App (1st) 172858, ¶ 31. Still, our result would be the same even under a *de novo* standard of review.

¶ 55    Section 2-1106(b) of the Code permits a court to impanel one or two additional jurors to serve as alternates. Here, 12 principal jurors and 2 alternates were selected before trial, all subject to the same jury selection procedures and sworn to the same oath. For the first 5 days of trial, they all heard the evidence. After the juror in question was dismissed, the first alternate juror was impaneled, and 12 jurors and the remaining alternate continued to hear the case and were instructed on the law. Following closing arguments, the trial court sent the alternate juror home, leaving a 12-person jury to deliberate uninterrupted until it reached a verdict. The court properly exercised its discretion when it dismissed the juror in question and replaced him with an alternate, and plaintiff suffered no discernable prejudice. See *People v. Carrilalez*, 2012 IL App (1st) 102687, ¶¶ 43-44 (Trial court acted within its discretion by removing a juror during deliberations after she disclosed that she was unable to understand the trial or render a decision because of a "language problem" and replaced her with an alternate juror, who had already left the courthouse). In sum, plaintiff's right to a 12-person jury was preserved, the court acted within its discretion, and no prejudice resulted from the juror's dismissal and replacement with an alternate.

¶ 56                                    B. Witness Bias

¶ 57    Plaintiff next argues that the trial court abused its discretion by "ignoring" Illinois Rule of Evidence 411 (eff. January 1, 2011) and prohibiting him from referencing defendant's liability

insurer, Federated Mutual Insurance Company, during Cignatta's cross-examination to demonstrate bias. Plaintiff asserts that Cignatta exhibited significant bias in favor of Federated Mutual, but the court's ruling barring any mention of liability insurance prevented him from effectively exploring that bias at trial. As evidence of Cignatta's alleged bias, plaintiff highlights Cignatta's online biography, which states that he provides expert witness testimony for insurance companies. Plaintiff also references emails produced during discovery which, in plaintiff's view, show Cignatta's willingness to align his expert opinions and testimonies with the interests of insurance companies. For example, in December 2020, Federated Mutual emailed Cignatta about the instant case, describing it as "one of the files where you did not write up a report so as not to have it discovered." Cignatta replied, in part:

> "Hopefully, this one will go away despite [plaintiff] being convinced that he won the lottery and wants his new home prize. Again, this case is technically very solid from an engineering perspective. Give me a call if you want me to generate a report or something else that will help make this case go away."

Plaintiff contends that he was unable to explore Cignatta's prior dealings with Federated Mutual and thus was unable to "expose the significant bias underlying Mr. Cignatta's opinions," including his willingness to help Federated Mutual make plaintiff's lawsuit "go away."

¶ 58    This issue, too, is forfeited. It is well established that a trial court's evidentiary rulings are not reviewable unless they are properly preserved. *Baumrucker v. Express Cab Dispatch, Inc.*, 2017 IL App (1st) 161278, ¶ 54. To preserve an issue for appeal, a party must both make a contemporaneous objection and raise the issue in a posttrial motion. *Kim v. Evanston Hospital*, 240 Ill. App. 3d 881, 892 (1992). Moreover, "[w]hen the court makes its rulings before trial in response to the parties' motions *in limine*, the rulings are interlocutory and remain subject to

reconsideration throughout trial." *Baumrucker*, 2017 IL App (1st) 161278, ¶54. Thus, "[t]he denial of a motion *in limine* does not in itself preserve an objection to disputed evidence that is introduced later at trial." *Simmons v. Garces*, 198 Ill. 2d 541, 569 (2002). Rather, a contemporaneous objection is required. *Id*.

¶ 59 Defendant's insurance coverage was addressed extensively during pretrial motions *in limine*. Relying on Rule of Evidence 411, plaintiff argued that evidence of defendant's liability insurance was admissible to challenge Cignatta's credibility, noting that Cignatta had likely[4] investigated other claims and provided expert witness testimonies and reports on behalf of Federated Mutual. Defendant conceded that plaintiff's inquiry into this area was "fair game," but it stated that it objected only to mentioning defendant's liability insurance.

¶ 60 The trial court denied plaintiff's motion *in limine*, reasoning that the communications cited by plaintiff did not suggest sufficient financial bias to justify disclosing defendant's insurance coverage to the jury. The court explained that plaintiff's motion impermissibly sought "open access to mention the defense has insurance," which it concluded would be "highly prejudicial." Nevertheless, the court made "certain accommodations" and instructed the parties to work together to craft questions that would allow plaintiff to probe Cignatta's impartiality without explicitly referencing defendant's insurance coverage. The court stated that "there should be a way to do that," and it suggested that referring to Federated Mutual as "defendant" was "probably the way to go."

---

[4]Plaintiff did not depose Cignatta and was therefore unaware of how many times Cignatta had investigated claims for Federated Mutual.

¶ 61 At trial, prior to Cignatta's testimony, plaintiff expressed concern that referring to Federated Mutual as "defendant" during cross-examination would allow Cignatta to testify that PetroChoice had only hired him for the instant litigation, which would obscure his relationship with Federated Mutual. Plaintiff requested that Cignatta be required to frame his answers specifically in reference to Federated Mutual rather than PetroChoice. Defendant countered that doing so would imply that PetroChoice had faced prior lawsuits, which was not the case.

¶ 62 In clarifying its prior ruling, the trial court emphasized the importance of not disclosing defendant's liability insurance coverage to the jury while safeguarding plaintiff's right to explore potential biases. It reiterated that there were other ways plaintiff could bring out Cignatta's purported bias, such as by asking him how many times he had testified for the defense in similar cases, including "companies that are similarly situated like PetroChoice." It stated that "there are other ways to ask that question, bring out that bias," and it noted that it and defense counsel had offered "excellent suggestions" of how to challenge Cignatta's alleged bias without mentioning defendant's insurance coverage. Plaintiff acknowledged the court's ruling and requested to make an offer of proof on this issue outside the presence of the jury. The court stated that plaintiff was free to make an offer of proof, if needed.

¶ 63 Despite the trial court's guidance and clarification of its ruling *in limine*, plaintiff opted not to meaningfully cross-examine Cignatta regarding his expert analysis and testimony for other defendants in the oil and gas industry. Plaintiff's exploration of this issue during Cignatta's cross-examination was as follows:

"Q. Can you quantify in terms of percentage the number of times you've testified for the plaintiff versus the defense?

A. Plaintiff versus a defendant would probably be somewhere around maybe 80 percent of the time for the defendant and 20 percent of the time for the plaintiff and then you get into respondent and complainant, administrative law and then you get into criminal. So the cases vary back and forth. I'm sorry. I don't really track them that well. General numbers.

Q. All right. The short and sweet answer would be 80/20?

A. That would be the best guess that I could give.

Q. All right. You talked about your hourly rate. Have you ever been engaged for your expert services by the defendant specifically prior to this case?

A. PetroChoice Fuel, no, I don't, -- I don't recall if—no, I don't recall PetroChoice ever working for them before."

Plaintiff then inquired generally as to Cignatta's company, Datanet Engineering, before turning to other topics.

¶ 64    As stressed by the trial court prior to Cignatta's testimony, plaintiff was free to highlight Cignatta's prior work history on behalf of other defendants in the oil and gas industry. However, when Cignatta denied previously being retained by PetroChoice for his expert opinion, plaintiff simply moved on without exploring the issue further. Nothing precluded him from questioning Cignatta about his prior retention by other oil and gas companies in litigation. Before Cignatta's testimony, the parties discussed permissible questioning outside the presence of the jury. Both the court and defense counsel proposed several approaches to address the topic while avoiding any mention of defendant's liability insurance, but plaintiff apparently opted against them all and failed to explore Cignatta's biases within the court's parameters. Furthermore, plaintiff neglected to make an offer of proof regarding the questions he wished to ask Cignatta. See Ill. R. Evid.

103(b)(3) (eff. Oct. 15, 2015) ("In civil trials, even if the court rules before or at trial on the record concerning the admission of evidence, a contemporaneous trial objection or offer of proof must be made to preserve a claim of error for appeal"). Having elected not to pursue this line of questioning at trial or make an offer of proof regarding the specific questions he wished to ask Cignatta, plaintiff cannot now complain that the trial court prevented him from "expos[ing] the significant bias underlying Mr. Cignatta's opinions."

¶ 65     Forfeiture aside, the trial court did not abuse its discretion in barring plaintiff from informing the jury of defendant's liability insurance coverage. Generally, evidence that informs the jury that a defendant is or is not insured against liability is inadmissible on relevancy grounds. *Imparato v. Rooney*, 95 Ill. App. 3d 11, 15 (1981). This is because insurance has no bearing on the question of negligence, and informing the jury of such coverage could impermissibly influence its verdict. *Rush v. Hamdy*, 255 Ill. App. 3d 352, 361 (1993). Rule of Evidence 411, which governs liability insurance, provides:

> "Evidence that a person was or was not insured against liability is not admissible upon the issue of whether the person acted negligently or otherwise wrongfully. This rule does not require the exclusion of evidence of insurance against liability when offered for another purpose, such as proof of agency, ownership, or control, or *bias* or prejudice of a witness." (Emphasis added.) Ill. R. Evid. 411 (eff. Jan. 1, 2011).

¶ 66     On appeal, plaintiff appears to argue that, because he wished to explore Cignatta's alleged biases as contemplated in the rule, the trial court should have reflexively allowed him to draw the jury's attention to defendant's liability insurance coverage. While plaintiff is correct that evidence of liability insurance may be admissible to show witness bias, plaintiff overlooks that the proffered evidence must also be evaluated under Illinois Rule of Evidence 403 (eff. Jan 1, 2011) to determine

whether its probative value is substantially outweighed by the danger of unfair prejudice or confusion. See *Private Bank v. Silver Cross Hospital and Medical Centers*, 2017 IL App (1st) 161863, ¶ 61. Here, in denying plaintiff's motion *in limine*, the court expressly found that the mention of insurance coverage in front of the jury would be "highly prejudicial" and its probative value was substantially "outweighed by the potential prejudice." It also stated that it was concerned that disclosing defendant's insurance coverage would "confuse the jury as to what the focus is here." The court did not abuse its discretion, particularly where it crafted a ruling that permitted plaintiff to challenge Cignatta's impartiality while minimizing the potential risk of undue prejudice defendant might suffer if the jury was informed of defendant's insurance coverage, as discussed above.

¶ 67                    C. Defendant's Closing Argument—IEPA Report

¶ 68    Plaintiff next argues on appeal that the trial court improperly "allowed repeated references to an undisclosed IEPA report during closing arguments." According to plaintiff, defendant failed to disclose an IEPA file or report during discovery, which deprived plaintiff of the opportunity to challenge defendant's characterization of the IEPA records at trial. He points to defendant's assertions during closing argument that the IEPA "closed its file" regarding plaintiff's residence without requiring any remediation. Plaintiff speculates that, "[f]or defendant to make a good faith argument that the IEPA opened and closed its file, counsel must have reviewed the file but failed to disclose the file to plaintiff." Plaintiff further contends that these comments prejudiced his case because they improperly invoked the authority of the state to mislead the jury into believing plaintiff's residence was not an environmental hazard. Plaintiff further states that, after trial, he submitted a request under the Illinois Freedom of Information Act (FOIA) (5 ILCS 140/1 *et seq*. (West 2022)) to the IEPA seeking information regarding whether defendant reported the spill to

the IEPA. According to plaintiff, the documents he received in response merely indicated that an IEPA *report* was "closed," but they do not "indicate that [the IEPA's] *file* was ever 'closed.' " (Emphasis in original.) Plaintiff maintains that, had defendant complied with discovery rules, he could have impeached Cignatta "to establish the IEPA opened and closed their *report*, not *file*." (Emphasis in original.)

¶ 69 Plaintiff has likewise forfeited his claims of error regarding this issue, because he did not object to Cignatta's testimony regarding the IEPA's response to the oil spill. The following exchange occurred during plaintiff's cross examination of Cignatta:

"Q: All right. And you reviewed *** the [IEPA] standards and whether they had a case file on this house and things of that nature, correct?

A: Oh, yes sir.

Q: Was there any requirement, recommendation, or directive from the [IEPA] to clean up or remediate anything in the yard in this case?

A: No, sir. I specifically spoke with the [IEPA] officials, and the file was closed. There was an incident[,] and the incident was cleaned up."

Defendant then moved on to questioning Cignatta regarding other topics, such as whether he had operated fuel pumps like the one used in this case.

¶ 70 Plaintiff neither objected to defendant's direct examination of Cignatta regarding his understanding of how the IEPA handled the instant matter nor cross-examined him on this point. Illinois Rule of Evidence 103(b)(3) (eff. Oct. 15, 2015) requires a contemporaneous objection at trial to preserve an issue for appeal, and plaintiff's failure to object deprived the trial court of the opportunity to rule on the admissibility of the testimony and deprived defendant's counsel of the opportunity to cure the purported error. Once that testimony was in evidence without objection

from plaintiff, it was appropriate for defendant to reference that testimony in closing argument. See *Eid v. Loyola University Medical Center*, 2017 IL App (1st) 143967, ¶ 62 ("[a]ttorneys are afforded wide latitude during closing argument and may comment and argue on the evidence and any inference that may be fairly drawn from the evidence"); *Jackson v. Board of Review of Department of Labor*, 105 Ill. 2d 501, 508 (1985) ("[i]t is well established that when hearsay evidence is admitted without an objection, it is to be considered and given its natural probative effect").

¶ 71 Likely in recognition of his failure to preserve this issue for appeal during Cignatta's testimony, plaintiff frames the purported error as having occurred during closing argument, when plaintiff *did* offer an objection. During defendant's closing statement, the following exchange occurred:

"MR. LUNDQUIST [(DEFENDANT'S COUNSEL)]: Did the plaintiff present anything from the [IEPA]? I'll tell you, the [IEPA] is a tough outfit. If there's anything going on with a spill, they're all over it.

MR. FERRIS [(PLAINTIFF'S COUNSEL)]: Objection. That's not a reasonable inference from the evidence, Judge. Arguing matters not in evidence.

THE COURT: Let's be clear this is just argument. The jury knows what was presented in evidence and will only consider the evidence that was presented. If an attorney says something that you do not recall was in the evidence, you will rely on your own recollection of the evidence.

You may proceed.

MR. LUNDQUIST: Thank you, your Honor. And for clarity, what I'm pointing out is not what you did hear. It's what you didn't hear. That's my whole point. The

plaintiff didn't offer any evidence from anybody from the [IEPA] that said there was a problem with this house. In fact, the only evidence you heard is that the [IEPA] closed its file. They signed off that nothing further needed to be done."

¶ 72    Plaintiff's objection during closing arguments came too late to preserve this issue for appeal, because Cignatta's testimony on this issue had already entered the record unchallenged. The trial court properly allowed defendant to reference the admitted testimony, reminding the jury that closing statements are "just argument" and that it should rely on its own recollection of the evidence.

¶ 73    Forfeiture aside, plaintiff's argument fails because it hinges on the assumption that defendant possessed a closed IEPA report or file and failed to disclose it. Indeed, plaintiff expressly states the assumption in his appellate brief, stating "[f]or defendant to make a good faith argument that the IEPA opened and closed its file, counsel must have reviewed the file but failed to disclose the file to plaintiff." The record does not support the assumption, because Cignatta testified about an oral conversation with IEPA officials—not a written report or file. Plaintiff's reliance on a posttrial FOIA response does not establish that defendant withheld any discoverable material. Moreover, plaintiff fails to demonstrate that defendant's reference to the IEPA during closing argument caused him any prejudice. Even equipped with a FOIA response from the IEPA, plaintiff does not dispute that the IEPA did not recommend or require any remediation, which was the precise point defendant made during closing argument. The trial court acted within its discretion, and, in the absence of prejudice, plaintiff's claim fails.

¶ 74          D. Defendant's Closing Argument—Opinion of Tank Condition

¶ 75    The next issue plaintiff raises also pertains to defendant's closing argument. Specifically, plaintiff contends that the argument was improper because it relied on statements by Cignatta

regarding the deterioration, rust, and corrosion of the tank—evidence that had been excluded at trial. Plaintiff takes issue with defendant's remarks during closing argument: "Unfortunately, the old [tanks] do wear out at some point," and "[t]he tank was heavily corroded." For context, during trial, the court sustained plaintiff's Rule 213 objection to Cignatta's undisclosed opinion that, because plaintiff's tank was 55 years old, it was expected that "[t]he tank and all its components deteriorate with time." The court struck the statement "deteriorate with time" and instructed the jury to disregard it. Plaintiff also questioned Cignatta regarding the rust and corrosion that he observed on the failed tank weld which, according to Cignatta, indicated that the tank was not properly maintained. Cignatta testified that "the vent was clearly compromised regarding the amount of accumulated debris not just right here but also along its length," and that "rust *** had accumulated in the pipe." Plaintiff objected at that point based on undisclosed Rule 213 opinion "with respect to rust in the pipe." The trial court sustained the objection and instructed the jury to "not consider rust in the pipe." Plaintiff argues on appeal that defendant's comments regarding tank wear and corrosion improperly referenced the excluded opinion evidence.

¶ 76    Once again, this issue is forfeited because plaintiff did not object when defendant made these comments during its closing argument. "Generally, the failure to object to alleged errors in an opponent's closing argument is considered a waiver of objection." *Zoerner v. Iwan*, 250 Ill. App. 3d 576, 585 (1993). An exception to this general rule may apply if the comments are so inflammatory and prejudicial that the plaintiff is denied a fair trial. *Jarmon v. Jinks*, 165 Ill. App. 3d 855, 864 (1987). In his appellate brief, plaintiff concedes that he did not object to these statements "and multiple other misstatements of the evidence" during closing argument, but he suggests that the issue was not forfeited because the trial court set "ground rules" and instructed the jury to disregard any argument not based on the evidence. Plaintiff cites no authority for the

proposition that a trial court may somehow preserve an issue for appeal on behalf of a party that neglected to contemporaneously object to allegedly improper comments at closing argument, and we therefore reject it. Forfeiture notwithstanding, plaintiff offers no argument that these comments caused him any prejudice—nor could he. The comments were neither unduly inflammatory nor prejudicial and do not even remotely constitute reversible error. Any error, if even there was error, was cured by the court's instruction that closing argument is not evidence and that the jury should disregard any argument that is not based on the evidence presented at trial. See *People v. Scott*, 194 Ill. App. 3d 634 (1990).

¶ 77                         E.  Non-Release of Audio Recording

¶ 78     Plaintiff next argues on appeal that the trial court erred in denying his request to release the audio recording of defendant's closing argument. He asserts that "the transcripts [do] not faithfully reflect the trial proceedings," and speculates that a statement by defendant's counsel during closing argument was either "omitted" or selectively deleted by the court reporter. Specifically, plaintiff asserts that defense counsel, in a raised voice, stated: "It's a fact that the EPA opened a file!" and "It's a fact the EPA closed its file!" Plaintiff further asserts that his objection to these statements is also absent from the official transcript. He argues that this omitted material "could be outcome determinative" because defendant's assertion concerning the IEPA's handling of its file was false.

¶ 79     Plaintiff's argument fails because he has not demonstrated any prejudice resulting from the alleged omission in the official transcript. As previously discussed, the official transcript already reflects that defendant explicitly referenced in its closing argument that the IEPA closed its file without recommending or ordering remediation of plaintiff's residence. The transcript thus already reflects the explicit reference of the IEPA opening and closing its file, consistent with the alleged omitted language. Even if plaintiff is correct that the transcript is missing defendant's

direct statement referring to the "fact that the EPA opened a file" and "fact that the EPA closed its file," the statements add no substantive content beyond what is already in the official transcript. Any additional or slightly rephrased statement would have made no discernible difference to the proceedings. Moreover, as previously discussed, plaintiff forfeited the substantive issue by failing to object to Cignatta's testimony on direct examination, where he stated: "I specifically spoke with the [IEPA] officials, and the file was closed. There was an incident[,] and the incident was cleaned up." Again, because this testimony was admitted without objection, defendant's reference to the IEPA's file during closing argument—whether through the recorded or allegedly omitted statements—was proper.

¶ 80                                    F. Two-Issue Rule

¶ 81    We need not address plaintiff's remaining arguments, which all relate to plaintiff's damages or contributory negligence, because the jury returned a general verdict in defendant's favor without specifying the basis for its decision, and plaintiff did not request special interrogatories. Those issues include: (1) defense counsel refreshing Cignatta's recollection with the precise section of the Plumbing Code that Cignatta opined plaintiff's sump pump violated: (2) the suitability of plaintiff's damages jury instruction; (3) the striking of plaintiff's list of personal property damages; and (4) the trial court's ruling that if plaintiff testified he could not afford to remediate the property, defendant could cross-examine him regarding the $1 million settlement he received from his insurer.

¶ 82    Under the two-issue rule, when a general verdict is supported by multiple independent grounds, the verdict will be upheld if at least one ground is free from error. *Lazenby v. Mark's Construction*, Inc., 236 Ill. 2d 83, 101 (2010). See also *Perez v. St. Alexius Medical Center*, 2022 IL App (1st) 181887, ¶ 64 (the two-issue rule "provides that a general verdict for the plaintiffs or

the defendants without special interrogatories will not be disturbed if the case involved two or more determinative issues, or two or more theories were presented, and there was sufficient evidence to support at least one of the issues or theories that was free from prejudicial error"). This rule has been applied broadly, including in cases with only two possible bases for the jury's general verdict in favor of the defendant). *Wright-Young v. Chicago State University*, 2019 IL App (1st) 181073, ¶ 107. Additionally, the two-issue rule has been codified. See 735 ILCS 5/2-1201(d) (West 2022) ("[i]f several grounds of recovery are pleaded in support of the same claim, whether in the same or different grounds, an entire verdict rendered for that claim shall not be set aside or reversed for the reason that any ground is defective, if one or more of the grounds is sufficient to sustain the verdict").

¶ 83    In this case, defendant denied the allegations in plaintiff's complaint, challenging both negligence and proximate cause, and asserted several affirmative defenses, including contributory negligence. The jury heard ample evidence from defendant's expert witness, Cignatta, that the cause of plaintiff's fuel tank failure was a combination of its age, material, and lack of maintenance. The jury was instructed to fill out Verdict Form C if it found either: (1) for defendant and against plaintiff, or (2) that plaintiff's contributory negligence was more than 50% of the total proximate cause of the injury or damage for which recovery was sought. Because the jury returned a general verdict on Verdict Form C in favor of defendant, and because plaintiff did not submit a special interrogatory as to the basis of the jury's finding, the jury's reasons for finding in defendant's favor are unknown. See *Lazenby*, 236 Ill. 2d at 101. The general verdict rendered by the jury creates a presumption that it found in defendant's favor on liability, as well as on every defense raised, including that plaintiff was greater than 50% negligent, thus barring plaintiff from recovering damages. *Id*. at 102. It is well established that if a defendant is not liable, any alleged

trial errors relating only to the question of damages offer no grounds for reversal. *Schuchman v. Stackable*, 198 Ill. App. 3d 209, 231 (1990). Here, the finding in favor of defendant on liability fully sustains the verdict, and plaintiff has not demonstrated the existence of reversible error on the issue of liability. Accordingly, we need not address plaintiff's remaining arguments, all of which pertain to contributory negligence or damages.

¶ 84                                    III. CONCLUSION

¶ 85    For the reasons stated, we affirm the judgment of the circuit court of Lake County.

¶ 86    Affirmed.